**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

SHOWBOAT CAR WASH LIMITED
PARTNERSHIP, LLLP

               Debtor.

Case No. 3:15-bk-03031-JAF

Chapter 11

**DEBTOR'S AMENDED[1] MOTION FOR AUTHORITY TO USE CASH**
**COLLATERAL *NUNC PRO TUNC***
**TO THE COMMENCEMENT OF THIS CASE**

**Introduction**

Showboat Car Wash Limited Partnership, LLLP, as its name suggests, is a freestanding drive through car wash located on Ponce De Leon Boulevard in St. Augustine, Florida,[2] and is, as of July 6, 2015, the debtor and debtor-in-possession in this Chapter 11 bankruptcy case ("Showboat").

In addition to the expensive and technologically advanced drive through car wash, Showboat provides a menu of car care services including, but not limited to, hand-waxing, full interior cleaning, carpet and leather treatments, and other similar services. Showboat employs approximately twenty-two (22) individuals and has been operated by its now sole owner, Mr. David P. Danzeisen ("Mr. Danzeisen"), for approximately five of the eight years since opening for business in or about 2007. By information and belief, other than some pension and social security, Showboat is Mr. Danzeisen's sole source of income.

---

[1]     Amended to correct a typo where the author intended to cite "362(d)(3)", but shows up in the original as "363(d)(3)", which doesn't make any since. A few non-material typos were also corrected as well.

[2]     For those familiar with the area, Showboat is the car wash on the right hand side of on Ponce De Leone just south of where King Street intersects and looks, quite literally, like a large river type showboat.

**Identification of Secured Party and Amount of Secured Debt**

Showboat's largest secured creditor is Chartered Enterprises Jacksonville, LLC ("Chartered").  By information and belief, Chartered's managing member, Mr. James R. Swanson ("Mr. Swanson"), and Mr. Danzeisen have known one another and have done business with one another for several years.

Chartered alleges that Showboat's debt to it secured by all Showboat property, including proceeds and profits ("Showboat Property"), equals $2.4 million.  However, as more particularly described in the Debtor's Motion for and Order of Substantive Consolidation (Doc. No. 12)(Classic Doc. No. 10) seeking as relief, consolidation of Showboat with a Showboat affiliate also owned by Mr. Danzeisen known as Classic Car Wash of Jacksonville, Inc. ("Classic"), the original obligation secured by all Showboat Property was $1.25 million held by Mercantile Bank, N.A. ("Mercantile").

The story appears to be that: on May 8, 2007, Showboat made a note payable to Mercantile for $1.25 million secured by all Showboat Property.  At that time, Mr. Danzeisen also owned another entity known as Ducky's Car Wash ("Ducky's").  On the same day, May 8, 2007, Chartered's predecessor sold a car wash to Ducky's for a purchase price of $900,000.00, which Ducky's borrowed from Mercantile with payment secured by all of Ducky's property.  Also on the same day, May 8, 2007, Chartered's predecessor sold Ducky's three (3) more car wash sites, purchased not with loan proceeds however, but through a self-financing arrangement Ducky's made with Chartered for the purchase price of $2,272,600.00 -- payment for which was secured by all of (formally Chartered's) Ducky's property.  In other words, Chartered's predecessor sold Ducky's $3,172,600.00 in car-wash type property for which Ducky's incurred the attendant secured obligations *and*

Showboat made a $1.25 million loan payable to Mercantile, which was cross-collateralized with property owned by Ducky's – all occurring on May 8, 2007.

Shortly thereafter, on or about September 16, 2009, Chartered purchased Showboat's obligations to Mercantile and Ducky's obligations to Mercantile from Mercantile rendering Chartered the sole holder of all obligations that Showboat and Ducky's had incurred on May 8, 2007.

Approximately a month later, Chartered, Showboat, Ducky's, and Classic entered into a "deed-in-lieu-of-foreclosure" transaction whereby i) Chartered took back all four car wash sites that it had sold to Ducky's a mere one year and four months prior for $3,172,600.00; ii) Chartered retained its secured interest in Showboat's property (as it was with Mercantile); iii) took Classic as additional collateral; iv) and restated the principal amount of the obligations outstanding from Showboat and Classic at $2.4 million.  By information and belief, no additional advances had been made under any of the obligations at issue under the operative documents relevant to this case.[3]

The logical, observable conclusion that this deed-in-lieu transaction appeared to have accomplished was to simply restore Showboat to its original loan with Mercantile having a principal balance of $1.25 million when considering that Chartered merely took back all the property it had just sold to Ducky's earlier.  Since the time of the deed-in-lieu transaction, by information and belief, Showboat and/or Classic has timely made payments on account of Chartered each month.  Yet, Chartered maintains that its claim in this case is

---

[3]     Except perhaps, by information and belief, approximately $40,000.00 in documentary stamps required by the deed-in-lieu transaction.

$2.4 million instead of $1.25 million – an approximate 49% more than the original Showboat obligation incurred just sixteen months earlier.[4]

### Cash Collateral

Under 11 U.S.C. § 363(c)(1), since Showboat is authorized to business under Sec. 1108, and the Court has not ordered otherwise, Showboat may enter into transactions and use property of the estate in the ordinary course of business.  Under 11 U.S.C. § 363(c)(2), Showboat may not use "cash collateral" unless Chartered consents or such use is authorized by a court, and under Sec. 363(e) the Court may prohibit use of cash collateral as is "necessary to provide adequate protection of such interest" – such interest being, in this case, Chartered's interest in cash collateral.

Cash collateral includes "profits." 11 U.S.C. § 363(a).  Under Sec. 552(b)(1), a creditor's pre-petition lien on property acquired prior to the petition date extends to property acquired after the petition date if the lien encumbers "proceeds, products, offspring, or profits."  11 U.S.C. § 552(b)(1).  This renders a post-petition "replacement lien" on cash collateral largely illusory.  *In re Wrecclesham Grange, Inc.* 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997).

Some bankruptcy courts have found that a lien on rents, profits, and the like is a separate interest in property separate from the underlying main collateral itself.  *Id*.  The theory being, an existing security interest in profits arises when the debtor realizes said profits. *Id*.  Adequate protection of the secured creditor's Sec. 552(b)(1) interest in profits acquired after the petition date is evaluated under Sec. 361, which is, essentially, assuring replenishment of what the secured creditor may loose as a direct result of the debtor's use

---

[4]     Classic was "free and clear", by information and belief, before it was collateral under the current arrangement with Chartered.

of the rents, profits, and the like.  *See*, 11 U.S.C. § 363(1)-(3).  Evaluating the "loss" of rents, profits, and the like may seem to begin and end with those words themselves, however, an analysis of "loss" depends on what was bargained for prior to the petition date.  If the pre-petition contract with an assignment of rents clause calls for monthly debt service in the amount of $15,000.00 per month and the debtor pays $15,000.00 per month post-petition, the secured creditor is not experiencing a loss that would require adequate protection of the security interest in rents and/or profits.

This is evident under Section 362(d)(3) of the Bankruptcy Code.  In this case, Showboat has filed its plan of reorganization ("Plan") that Showboat obviously believes will be confirmed in a reasonable time (disclosure statement should be finished by the end of the week).  Very relevant here, Showboat believes -- prior to the petition date, Showboat was ordered by the state court to continue payment (by consent of the lien holder) of the contractually due payments monthly.  A copy of the state court order is attached as Exhibit A.  By information and belief, the July, 2015 payment had been made to Chartered (as was all other payments as ordered), and therefore, Chartered's 552(b)(1) interest in profits for the month of July, 2015 has been satisfied.

Also, "in the **debtor's sole discretion**, *notwithstanding section 363(c)(2)*, [monthly payments . . . may] be made from rents or *other income* generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate . . . and are in an amount equal to interest at the then applicable non default contract rate of interest on the value of the creditor's interest in the real estate."  11 U.S.C. § 362(d)(3) & (d)(4).

### Adequate Protection Offered

By information and belief, the non-default rate of interest applicable as of the petition date is 6% under the governing loan document between Showboat and Chartered. Showboat believes that the value of the Showboat Property is $1.8 million (Showboat believes that the value of Classic is $600,000.00 – however, Classic is not generating any cash collateral and has not yet been consolidated with this case). Accordingly, Showboat offers monthly payments to commence August 1, 2015 in the amount of $9,000.00 per month (equal to 6% of $1.8 million).

### Other Cash Collateral Items

This case was filed on an emergency basis. It is anticipated that the schedules will be completed in short order, within the next fourteen (14) days. It is also anticipated that the number Showboat's unsecured creditors are fewer than twenty but more than five, and that the amounts are more than $10,000.00 but less than $100,000.00 consisting of trade creditors. Showboat reserves the right to update this cash collateral motion at a later time should the information provided later compel a materially different analysis than what has been employed at this time. Showboat is not adverse to a ten (10) day grace period and ninety-six (96) hour notice period and stay relief upon an affidavit of default in payment of adequate protection.

### Jurisdiction, Venue, and Authority for Relief

The Court has jurisdiction to authorize cash collateral use pursuant to 28 U.S.C. § 1334. This is a "core proceeding." 28 U.S.C. § 157(M). Venue is proper. 28 U.S.C. § 1401; Fed.R.Bankr.P. 1014. The Court's authority to enter orders authorizing cash collateral use derives from 11 U.S.C. § 363(c)(2) or 11 U.S.C. § 362(d)(3), as applicable.

**WHEREFORE**, Showboat respectfully request that the Court enter an order authorizing cash collateral use conditioned upon the payment of adequate protect in the amount of $9,000.00 per month to Chartered.  Showboat believes that this could be a final order at the first hearing on this issue.

Respectfully submitted on July 14, 2015

MEARKLE|TRUEBOOD|ADAM, PL

*/s/ Brett A. Mearkle*
Brett A. Mearkle
Bar No. 644706

218 N. Broad Street
Jacksonville, FL 32202
(904) 352-1342
(904) 800-1058 facsimile
bmearkle@mtalawyers.com

**Certificate of Service to Follow**

**Exhibit A.**

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO: 16-2014-CA-007972

DIVISION: CV-A

CHARTERED ENTERPRISES –　　　　　)
JACKSONVILLE, LLC, a Florida
limited liability company,　　　　　　)

      Plaintiff,　　　　　　　　　　)

v.　　　　　　　　　　　　　　　　)

SHOWBOAT CAR WASH LIMITED　　)
PARTNERSHIP, LLLP, a Florida
limited liability limited partnership,　　)
CLASSIC CAR WASH OF
JACKSONVILLE, INC., DAVID P.　　　)
DANZEISEN, CITY OF ST.
AUGUSTINE, FLORIDA CODE　　　　)
ENFORCEMENT, ADJUSTMENT
AND APPEALS BOARD, KATHRYN　　)
C. DANZEISEN, and RICHARD
SUNDEMOND, CPA, also known as　　)
JOHN SUNDEMAN, in his capacity as
a court appointed receiver,　　　　　　)

      Defendants.　　　　　　　)

_____)

**CONSENT ORDER DIRECTING DEFENDANT
SHOWBOAT TO MAKE PAYMENTS DURING THE
<u>PENDENCY OF THESE FORECLOSURE PROCEEDINGS</u>**

This Case came before the Court pursuant to the plaintiff, Chartered

Enterprises – Jacksonville, LLC's ("Chartered"), motion for an order requiring

defendants Showboat Car Wash Limited Partnership, LLLP ("Showboat") and

Classic Car Wash of Jacksonville, Inc. ("Classic"; collectively with Showboat, the "Mortgagors"), to show cause why an order requiring Mortgagors to make payments during the pendency of these foreclosure proceedings or vacate the premises that are the subject of Chartered's Verified Amended Complaint (the "Motion"). The Court having reviewed the Motion, Chartered's Verified Amended Complaint and the consent of counsel for Chartered and the Mortgagors appearing below, it is:

ORDERED:

1.      The preliminary findings and conclusions in this Order are not binding on the parties or an adjudication of this case on the merits.

2.      This is an action to foreclose real property that is not residential.

3.      Under the terms of the October 20, 2009 Amended, Modified, Restated and Renewal Note attached as Exhibit O to Chartered's Amended Verified Complaint (the "2.4 Note"), Showboat was required to pay the outstanding balance due under the 2.4 Note on or before October 1, 2014.

4.      Showboat has not repaid the 2.4 Note.

5.      Prior to the October 1, 2014 maturity of the 2.4 Note, Showboat was required to make monthly payments to Chartered in the amount of $13,500 per month under the terms of the 2.4 Note.

6.      The 2.4 Note was secured by the Mortgage and Security Agreement recorded in Official Records Book 2915, page 452, St. Johns County, Florida public records (the "SB 125 Mortgage"), which perfected a lien against the property in St. Johns County, Florida described on Exhibit A (the "Showboat Property"); and (ii) Mortgage and Security Agreement recorded in Official Records Book 15049, page

2

330, Duval County, Florida current public records (the "Classic Mortgage"), which perfected a lien against the property in Duval County, Florida described on Exhibit B (the "Classic Property").

7.      Pursuant to Section 702.10(2)(e), Florida Statutes, beginning February 1, 2015 and or the first day of each month thereafter, Showboat shall make payments to Chartered at the rate of $13,500 per month.  Checks shall be made payable to Chartered Enterprises-Jacksonville, LLC and sent to the following address:

>   Chartered Enterprises-Jacksonville, LLC
>   c/o Allan E. Wulbern
>   Smith Hulsey & Busey
>   225 Water Street, Suite 1800
>   Jacksonville, Florida  32202

8.      All amounts paid pursuant to this Order shall be credited in accordance with the terms of the 2.4 Note.   Payments made under this Order do not constitute a cure of any default or a waiver of any other defense to the mortgage foreclosure action.

9.      Upon the failure of Showboat to make payments required by this Order, Chartered is entitled to take possession of the Show Boat Property and the Classic Property (collectively, the "Properties"), without the requirement of any further order of the Court, and may take all appropriate steps to secure the premises during the pendency of the foreclosure action.

10.     Upon the filing of an affidavit with the Clerk of Court that the Properties have not been vacated pursuant to this Order, the Clerk shall issue a writ of possession for the Properties.

11.    This Order shall be stayed pending final adjudication of the claims of the parties if Showboat files with the Court a written undertaking executed by a surety approved by the Court in an amount equal to the unpaid balance of the 2.4 Note, including all principal, interest, unpaid taxes, and insurance premiums paid by Chartered.

DONE AND ORDERED in Jacksonville, Duval County, Florida, this _____ day of _____, 2015.

ORDER SIGNED

JAN 3 0 ___

/s/ THOMAS M. BEVERLY
CIRCUIT JUDGE

_____
Thomas M. Beverly, Circuit Judge

Copies to:

ORDER SIGNED

JAN 3 0 2015

/s/ THOMAS M. BEVERLY
CIRCUIT JUDGE

Brett A. Mearkle, Esq.
Mearkle, Trueblood, Adam, P.L.
218 North Broad Street
Jacksonville, Florida 32202
bmearkle@mtalawyers.com

Allan E. Wulbern, Esq.
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, Florida 32202
awulbern@smithhulsey.com

Kathryn C. Danzeisen
25485 Marsh Landing Parkway
Ponte Vedra Beach, Florida 32082
kcdesq@hotmail.com

John Sundeman
1 Sebastian Avenue
St. Augustine, Florida 32084

4

## CONSENT

Counsel for Chartered Enterprises – Jacksonville, LLC, Showboat Car Wash Limited Partnership, LLLP, and Classic Car Wash of Jacksonville, Inc. consent to the entry of the foregoing Order.

SMITH HULSEY & BUSEY                    Mearkle, Trueblood, Adam, P.L.

By: _____          By: _____
     Allan E. Wulbern                        Brett A. Mearkle, Esq.

Florida Bar Number 175511              Florida Bar Number 644706
225 Water Street, Suite 1800           218 North Broad Street
Jacksonville, Florida 32202            Jacksonville, Florida 32202
(904) 359-7700                         (904) 352-1342
(904) 359-7708 (facsimile)             (904) 352-1814 (facsimile)
awulbern@smithhulsey.com               bmearkle@mtalawyers.com

Attorneys for Chartered Enterprises –  Attorneys for Showboat Car Wash
Jacksonville, LLC                      Limited Partnership, LLLP,  Classic Car
                                       Wash of Jacksonville, Inc.

00891597.DOC

5

# EXHIBIT A

## Legal Description

Lots 12, 13, 14, 15, 23, 24, 25 and 26, Block A, ANDALUCIA PARQUE, according to the plat thereof, recorded in Map Book 3, page 14, of the public records of St. Johns County, Florida, EXCEPTING THEREFROM those portions being conveyed in Deed Book 248, page 114, Deed Book 247, page 610, and Deed Book 248, page 212, of the public records of St. Johns County, Florida.

# EXHIBIT B

## Legal Description

A part of Block 4, Section 31, Township 3 South, Range 26 East, Jacksonville Heights, Duval County, Florida (formerly Clay County, Florida) as recorded in Plat Book 5, page 93, of the Current Public Records of said Duval County, Florida being more particularly described as follows: Commence at the intersection of the centerline of Interstate 295 (State Road 9-A, a 300 foot right of way as now established) with the baseline of survey of Blanding Boulevard as established by the Department of Transportation right of way Plan 72170-2508 (a 260 foot right of way as now established); thence South 00°02'42" East along said baseline, 895.19 feet; thence North 89°57'18" East, 90.00 feet to a Department of Transportation right of way marker on the Easterly right of way line of Blanding Boulevard; thence South 00°02'42" East along said right of way, 429.91 feet to the Point of Beginning; thence North 89°57'18" East, 133.00 feet; thence North 00°02'42" West, 14.15 feet; thence South 87°23'57" East, 132.14 feet; thence South 52°56'58" West, 39.00 feet; thence South 56°14'29" West, 60.01 feet; thence South 26°05'32" West, 156.93 feet; thence South 42°13'19" West, 81.45 feet; thence South 45°11'15" West, 58.37 feet; thence South 89°57'18" West, 18.58 feet to the Easterly right of way line of Blanding Boulevard; thence North 00°02'42" West along said Easterly right of way line, 291.00 feet to the Point of Beginning.